SAMUEL P. WILLIAMS *vs.* GEORGE H. CLOWES ET AL.

Third Judicial District, New Haven, June Term, 1902.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The ultimate conclusion of the trial court, that the plaintiff—who sought to recover his commission for effecting a loan—was the " procuring cause " of the loan, will not be reviewed on appeal, unless it is legally inconsistent with the subordinate or evidential facts found, or violates the settled rules of logic and sound reasoning.

A loan obtained at the request of the defendant and for his benefit, may properly be alleged to have been procured for him, although in form made to a newly organized company in which he was largely interested.

It is competent for the trial court to measure the reasonable value of a broker's services in procuring a loan, by the amount of the commission usually paid in such cases.

Argued June 4th—decided July 18th, 1902.

ACTION to recover for services as a broker in procuring a loan of $300,000, brought to the Superior Court in New Haven County and tried to the court, *George W. Wheeler, J.;* facts found and judgment rendered for the plaintiff against the defendant Clowes, and appeal by him for alleged errors in the rulings and findings of the court. *No error.*

The case is sufficiently stated in the opinion.

*John O'Neill,* for the appellant (defendant Clowes).

*Edward F. Cole,* for the appellee (plaintiff).

TORRANCE, C. J. The plaintiff brought this suit against Clowes and Randolph, individually, and against the latter as administrator of Edward F. Randolph, to recover for services in procuring a loan of money. The court rendered judgment in favor of Randolph, individually and as administrator, and against Clowes, and Clowes alone appeals.

The principal reasons of appeal in the case may, for convenience of discussion, be divided into two classes. The first class relates to the action of the trial court in refusing to correct, modify, or add to the finding; while the second relates to the action of the court in finding certain facts, or drawing certain conclusions, from the other facts found.

Under the first class the defendant claims, in substance, that the trial court erred (1) in refusing to find, as requested, certain facts set forth in the draft of finding; (2) in refusing to make certain additions to, and corrections of, the finding, as requested in the motion to correct. In connection with this part of the case all the evidence is certified up.

Upon a careful examination of that evidence it does not appear that the trial court erred, as alleged in the first class of the reasons of appeal, either in failing to find the facts it refused to find, or in refusing to correct, add to, or modify, the finding as requested by the defendant; and consequently the finding as made must stand.

The material facts found are in substance these: Prior to December 18th, 1898, Edward F. Randolph and Clowes, as copartners under the name of Randolph and Clowes, carried on the business of manufacturing metal goods in Waterbury. Randolph died on the 18th day of December, 1898, and an administrator was appointed on his estate. After his death Clowes, as surviving partner, carried on said business until about August 1st, 1899. When Randolph died the copartnership owned a valuable plant, and was indebted to various creditors in the sum of about $300,000.

Clowes desired to secure control of the business, and, as a means to this end, shortly after Randolph's death contemplated having the business taken over by a company to be organized. The copartnership creditors were pressing for

payment, and Clowes, who was anxious to devise a plan to take up this indebtedness, requested the plaintiff to procure a loan of $300,000 upon the plant, with the proceeds of which loan the debts could be paid. For sometime prior to the death of Randolph the plaintiff, at the request of Clowes, had been engaged in looking for a loan on this plant. In all, he was at work on this about one year. Nothing as to the terms of the loan was stated. Clowes intended that the loan should be made by the new company, upon the plant, and this had been his plan from the first, as the plaintiff in a general way knew. Clowes agreed to pay the usual commission of one per cent for negotiating such loan, and this was the reasonable value of the plaintiff's services subsequently rendered. The plaintiff, under his employment by Clowes, saw certain Boston people about this matter, but at the request of Clowes he abandoned his efforts in this direction. About July 1st, 1899, Clowes said to the plaintiff that he preferred to have Waterbury people make the loan, and that he would take a loan of $300,000. In the early part of July the plaintiff saw Miller, a Waterbury capitalist, about this loan, and as a result of their talk Miller offered to loan on this plant $250,000, and plaintiff reported this offer to Clowes who said he could not get along with less than $300,000. Subsequently, at the plaintiff's house, there was a meeting of several gentlemen, including the plaintiff, Clowes, Miller, and the representatives of Randolph's estate, to see if Miller might not be induced to raise his offer of loan to $300,000. Nothing came of this meeting. About the middle of July another meeting was held at plaintiff's office in Waterbury, at which Clowes, his attorney, the plaintiff, and Miller were present. Miller offered to loan the $300,000, provided he received a bonus of $25,000 of the preferred and $25,000 of the common stock of the new company proposed to be organized. It was then expected that the new company would be capitalized at $900,000: $100,000 of the preferred stock to remain as treasury stock, $400,000 to be issued of preferred, and $400,000 of common stock; the Randolph estate to have the preferred, and Clowes to have the greater part of the common stock. Clowes agreed

to this, subject to his ability to get the Randolph estate to agree to it. The next day Clowes informed the plaintiff and Miller that the estate consented, and Miller told Clowes to go ahead and organize the new company and he would be a director. Reliance was placed on Miller's promises, and other efforts to get financial assistance were abandoned. Subsequently a corporation was duly organized under the laws of New Jersey. At the first meeting of its incorporators, July 31st, 1899, at which the plaintiff, Miller, Clowes, and the representatives of Randolph were present, a vote was passed reciting Miller's agreement to loan $300,000, and authorizing the directors to make such loan when title was acquired to the copartnership plant. The company was authorized to take over said plant, pay off its indebtedness with said loan, and pay for said assets by the issue of $500,000 preferred and $400,000 common stock of said company. The directors at a meeting held the same day passed appropriate votes to carry out the votes of the incorporators, and elected Clowes treasurer and general manager. Clowes, as surviving partner, turned over the plant to the new company, and the company agreed to pay the indebtedness of Randolph & Clowes, and of Clowes as surviving partner. The debts remained in amount about the same as they were at the death of Randolph. The directors held various meetings and on August 15th, 1899, Miller said he had not got the full amount of the loan, and on the 22d of that month "he refused to make the loan on present conditions. The real reason for Miller's refusal to carry out his agreements was that he thought he saw a way to make a better bargain, and he desired to get control of the company, and get rid of Clowes. . . . On August 29th, 1899, Clowes resigned as treasurer, on condition that his salary continue, and upon the representations to him that Miller would make the loan if he would resign." After Clowes resigned Miller did not make the loan for a time, and between August 29th and September, while the copartnership creditors were pressing for payment and a receivership threatened, the Randolph estate offered to sell its preferred stock to Clowes, but nothing came

of this. On the 5th of September, 1899, the newly formed company, Miller, and the Randolph estate, entered into a written agreement in which, among other things, the estate agreed to sell and Miller agreed to buy all the interest of the estate in the stock of the company for the price of $100,000, and Miller also agreed to loan to said company, at once, the sum of $300,000, upon a mortgage of its plant to be made by it to him. "The company was organized on the plan Clowes had devised or assented to. On September 5th, 1899, Miller made the loan for $300,000 on the plant, and the proceeds were used to pay the debts of the copartnership." Clowes "believed and testified that he thought Williams had earned his commission, but that the new company ought to pay him." Both Randolph and the new company "never knew or authorized the employment of the plaintiff to negotiate the loan for which the plaintiff claims to recover a commission, nor did they ratify such employment."

The trial court finds that "the procuring cause of this loan was the plaintiff, and he was, in procuring the same, acting under his employment by Clowes."

In the trial court the defendant Clowes contended, in substance, that the facts found did not justify the conclusions, either as of law or of fact, (1) that the plaintiff was the procuring cause of the loan made, or (2) that the plaintiff was entitled to a commission for his services in procuring it. The trial court overruled these claims, and its action in so doing is assigned for error.

The trial court has found that Clowes, and Clowes alone, employed the plaintiff, at the usual rate of commission, to procure a loan of $300,000 to be made to the company about to be formed by Clowes and others, for the purpose, principally, of carrying on a business in which Clowes was deeply interested, and paying debts for which he was liable, the loan to be secured by a mortgage of the copartnership plant, to be made by the new company after said plant had been transferred to it. The plaintiff thereafter interviewed Miller and others about this matter, and finally induced Miller to agree to make such a loan to the new company about to be formed,

on certain conditions which were fully agreed to by all con-
cerned. On the faith and strength of Miller's agreement the
new company was formed and it became the owner of the
copartnership plant. The corporators and directors of the
new company, of whom Miller was one, recited upon its rec-
ords, with Miller's knowledge and consent, that Miller had
agreed to make said loan substantially upon the terms agreed
upon between Miller and the plaintiff at first. Then Miller,
seeing a way to make a better bargain for himself and there-
by get control of the new company and get rid of Clowes,
broke his agreement to make the loan and refused to make it
unless Clowes resigned as treasurer of the new company.
Thereupon Clowes, willing to sacrifice his office rather than
to have his entire scheme fail now, resigned as treasurer,
and immediately thereafter Miller makes the loan to the new
company and is secured by mortgage from it as agreed. There
are no other facts found which essentially affect the force of
the facts last above stated, and we think they fully justified
the court in holding that the plaintiff was the procuring cause
of the loan, and was entitled to his commission from Clowes
alone; and certainly we cannot say upon the record before
us that the court acted unreasonably in so holding. That
being so, the conclusion of the trial court upon the two points
in question is final. *Hoadley v. Savings Bank of Danbury,*
71 Conn. 599, 608.

It was further claimed in the trial court that there was a
variance between allegation and proof in this, that the allega-
tion was that the plaintiff procured the loan for the defend-
ants, while the proof was that he procured it for the company.
No objection to evidence upon this ground appears to have
been taken.

The trial court properly overruled this claim. Inasmuch
as the loan was procured for Clowes and at his request, and
upon his promise to pay the commission for procuring it,
and was made to the very company to which he desired to
have it made, it was, under the circumstances of this case,
sufficiently well described in the complaint as one made to
Clowes.

The trial court found that Clowes agreed to pay to the plaintiff the usual commission of one per cent for negotiating this loan, and then amended that finding by adding these words : " And this was the reasonable value of Williams' services subsequently rendered, which fact I find from the fact that it was the usual commission paid."

In the two remaining assignments of error the defendant claims that the court was not justified (1) in amending the finding in that way, (2) in finding the reasonable worth of the services of the plaintiff from the amount of the usual commission.

The first of these claims is put upon the ground that " there was no allegation of this kind in the complaint." The complaint contained the common count that the plaintiff performed work for the defendant of the price and value of $3,000. This, so far as the record discloses, remained in the complaint, and under it the court was entitled to make the finding complained of.

As to the second of these claims, we think the court upon the facts in this case committed no error in measuring the reasonable value of the plaintiff's services by the amount of the usual commission.

There is no error.

In this opinion the other judges concurred.